**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SHUKRI SAKKAB, an individual, on behalf of himself, and on behalf of all persons similarly situated,
*Plaintiff-Appellant*,

v.

LUXOTTICA RETAIL NORTH AMERICA, INC., an Ohio corporation,
*Defendant-Appellee*.

No. 13-55184

D.C. No.
3:12-cv-00436-GPC-KSC

OPINION

Appeal from the United States District Court
for the Southern District of California
Gonzalo P. Curiel, District Judge, Presiding

Argued and Submitted
June 3, 2015—Pasadena, California

Filed September 28, 2015

Before: Milan D. Smith, Jr., and N. Randy Smith, Circuit Judges, and Joan H. Lefkow,[*] Senior District Judge.

---

[*] The Honorable Joan Humphrey Lefkow, Senior District Judge for the United States District Court for the Northern District of Illinois, sitting by designation.

Opinion by Judge Milan D. Smith, Jr.;
Dissent by Judge N.R. Smith

## SUMMARY[**]

### Federal Arbitration Act / CA Private Attorney General Act

The panel reversed the district court's order granting Luxottica Retail North America, Inc.'s motion to compel arbitration of claims and dismissing plaintiff's first amended complaint, in a putative class action raising class employment-related claims and a non-class representative claim for civil penalties under the Private Attorney General Act.

Luxottica sought to compel arbitration under a dispute resolution agreement contained in its Retail Associate Guide. Plaintiff argued that the portion of the alternative dispute resolution agreement prohibiting him from bringing any PAGA claims on behalf of other employees was unenforceable under California law.

After the district court entered judgment in this case, the California Supreme Court announced the rule in *Iskanian v. CLS Transportation Los Angeles*, LLC, 59 Cal. 4th 348 (2014), barring the waiver of representative claims under PAGA.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the waiver of plaintiff's representative PAGA claim could not be enforced. The panel held that the Federal Arbitration Act did not preempt the California rule announced in *Iskanian*. Specifically, the panel held that following the logic of *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011), the *Iskanian* rule is a "generally applicable" contract defense that may be preserved by the FAA's § 2 savings clause, provided it did not conflict with the FAA's purposes. The panel further found that the *Iskanian* Rule did not conflict with the FAA's purposes.

The panel held that the non-PAGA claims in the first amended complaint must be arbitrated. The panel remanded for the district court and the parties to decide in the first instance where plaintiff's representative PAGA claim should be resolved, and to conduct other proceedings consistent with this opinion.

Dissenting, Judge N.R. Smith would hold that the majority should have applied *Concepcion* and deferred to the FAA's "liberal federal policy favoring arbitration." Judge N.R. Smith would hold that the *Iskanian* rule is preempted by the FAA, and he would affirm the district court.

---

## COUNSEL

Kyle R. Nordrehaug (argued), Norman B. Blumenthal, and Aparajit Bhowmik, Blumenthal, Nordrehaug & Bhowmik, La Jolla, California, for Plaintiff-Appellant.

Keith A. Jacoby (argued), Scott M. Lidman, and Judy M. Iriye, Littler Mendelson, P.C., Los Angeles, California, for Defendant-Appellee.

Andrew J. Pincus (argued) and Archis A. Parasharami, Mayer Brown LLP, Washington, D.C., for Amici Curiae.

## OPINION

M. SMITH, Circuit Judge:

This appeal presents issues of first impression regarding the scope of Federal Arbitration Act (FAA) preemption, 9 U.S.C. § 2 *et seq.*, and the meaning of the Supreme Court's decision in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011). We must decide whether the FAA preempts the California rule announced in *Iskanian v. CLS Transportation Los Angeles, LLC*, 59 Cal. 4th 348 (2014), which bars the waiver of representative claims under the Private Attorneys General Act of 2004 (PAGA), Cal. Lab. Code § 2698 *et seq*. After closely examining *Concepcion* and the Court's other statements regarding the purposes of the FAA, we conclude that the *Iskanian* rule does not stand as an obstacle to the accomplishment of the FAA's objectives, and is not preempted. We reverse the judgment of the district court and remand for further proceedings.

## FACTS AND PROCEDURAL BACKGROUND

The Plaintiff-Appellant, Shukri Sakkab (Sakkab), is a former employee of Lenscrafters, an eyewear retailer owned by the Defendant-Appellee, Luxottica Retail North America, Inc. (Luxottica). On January 17, 2012, Sakkab filed a putative class action complaint against Luxottica in the Superior Court of the State of California in and for the County of San Diego. The complaint asserted four causes of action arising out of Sakkab's employment by Luxottica,

including (1) unlawful business practices, (2) failure to pay overtime compensation, (3) failure to provide accurate itemized wage statements, and (4) failure to pay wages when due. The complaint alleged that Luxottica misclassified Sakkab and other employees as supervisors so that they would be exempt from overtime wages and meal and rest breaks. Luxottica answered and timely removed the case to federal court. On March 27, 2012, Sakkab filed a first amended complaint (FAC) adding a non-class, representative claim for civil penalties under the PAGA.

On April 23, 2012, Luxottica filed a motion to compel arbitration under the dispute resolution agreement contained in its "Retail Associate Guide." The agreement provided, in pertinent part:

> You and the Company each agree that, no matter in what capacity, neither you nor the Company will (1) file (or join, participate or intervene in) against the other party any lawsuit or court case that relates in any way to your employment with the Company or (2) file (or join, participate or intervene in) a class-based lawsuit, court case or arbitration (including any collective or representative arbitration claim).[1]

---

[1] According to Luxottica, two different versions of the dispute resolution agreement existed during the time that Luxottica employed Sakkab. In June 2011, Luxottica circulated a revised version of the dispute resolution agreement. The revised version provided:

> You and the Company each agree that, no matter in what capacity, neither you nor the Company will (1) file (or join, participate or intervene in) against the

Sakkab signed an acknowledgment indicating that he understood and agreed to the terms of the dispute resolution agreement on June 25, 2010.

On January 10, 2013, the district court granted Luxottica's motion to compel arbitration and dismissed the FAC. The court noted that Sakkab did not dispute that his first four claims were arbitrable. Sakkab argued, however, that the portion of the alternative dispute resolution agreement prohibiting him from bringing any PAGA claims on behalf of other employees was unenforceable under California law. For this reason, Sakkab argued, even if he was required to arbitrate his claims, he could not be denied a forum for his representative PAGA claim. The district court rejected Sakkab's argument that the right to bring a

---

> other party any lawsuit or court case that relates in any way to your employment with the Company or (2) file (or join, participate or intervene in) a class-based lawsuit or court case (including any collective action) that relates in any way to your employment with the Company or (3) file (or join, participate or intervene in) a class-based arbitration (including any collective arbitration claim) with regard to any claim relating in any way to your employment with the Company to the extent permitted by applicable law.

Sakkab acknowledged that he understood and agreed to the terms of the revised version. For reasons that are not entirely clear, the district court assumed that the earlier version governed the arbitrability of this dispute. We need not resolve which version of the agreement governs. Neither party has argued that the district court erred by construing the earlier version of the agreement instead of the later version, or that the results would be any different if one version applied instead of the other. On appeal, Sakkab concedes that the version relied on by the district court governs, and that this version purports to prohibit him from arbitrating representative PAGA claims.

representative PAGA claim is unwaivable under California law. At the time, the California Supreme Court had not yet considered whether PAGA waivers were enforceable under California law. Relying on the Supreme Court's decision in *AT&T Mobility LLC v. Concepcion*, the district court concluded that the FAA would preempt a state rule barring waiver of PAGA claims. The court then granted the motion to compel arbitration of the claims in the FAC, dismissed Sakkab's complaint, and entered judgment. This timely appeal followed.

## JURISDICTION AND STANDARD OF REVIEW

The district court had jurisdiction under 28 U.S.C. § 1332(d)(2). We have appellate jurisdiction under 28 U.S.C. § 1291 because this is an appeal from a final judgment of the district court.

"The district court's decision to grant or deny a motion to compel arbitration is reviewed de novo." *Knutson v. Sirius XM Radio Inc.*, 771 F.3d 559, 564 (9th Cir. 2014) (quoting *Bushley v. Credit Suisse First Boston*, 360 F.3d 1149, 1152 (9th Cir. 2004)).

## DISCUSSION

After the district court entered judgment in this case, the California Supreme Court ruled that PAGA waivers are unenforceable under California Law. *Iskanian*, 59 Cal. 4th 348. On appeal, Luxottica argues that the FAA preempts the *Iskanian* rule. After considering the history of the PAGA statute and the Supreme Court's FAA preemption cases, we hold that the FAA does not preempt the *Iskanian* rule.

## I.  The Labor Code Private Attorneys General Act

California's Labor Code Private Attorneys General Act of 2004, Cal. Lab. Code § 2698 *et seq.*, "authorizes an employee to bring an action for civil penalties on behalf of the state against his or her employer for Labor Code violations committed against the employee and fellow employees, with most of the proceeds of that litigation going to the state." *Iskanian*, 59 Cal. 4th at 360.  An action brought under the PAGA is a type of qui tam action.  *Id*. at 382.

The PAGA was enacted to correct two perceived flaws in California's Labor Code enforcement scheme.  *Id*. at 378–79. The first flaw was that civil penalties were not available to redress violations of some provisions of the Labor Code.  *Id*. at 378.    Those provisions only provided for criminal sanctions, not civil fines, and could only be enforced in criminal prosecutions brought by district attorneys, not in civil actions brought by the Labor Commissioner.  *See id*. at 379.  As a result, many violations of the Labor Code went unpunished.  *Id*.  The PAGA addressed this problem by providing for civil penalties for most Labor Code violations. "For Labor Code violations for which no penalty is provided, the PAGA provides that the penalties are generally $100 for each aggrieved employee per pay period for the initial violation and $200 per pay period for each subsequent violation."  *Id*. (citing Cal. Lab. Code § 2699(f)(2)).[2]

---

[2] A court may award a lesser amount "if, based on the facts and circumstances of the particular case, to do otherwise would result in an award that is unjust, arbitrary and oppressive, or confiscatory."  Cal. Lab. Code § 2699(e)(2).

The second flaw the PAGA addressed was that, even where the Labor Code provided for civil penalties, "there was a shortage of government resources to pursue enforcement." *Id*.; *see also* 2003 Cal. Stat. ch. 906 § 1. The legislative history of the PAGA describes the legislature's perception of the seriousness of this problem:

> "Estimates of the size of California's 'underground economy'—businesses operating outside the state's tax and licensing requirements—ranged from 60 to 140 billion dollars a year, representing a tax loss to the state of three to six billion dollars annually. Further, a U.S. Department of Labor study of the garment industry in Los Angeles, which employs over 100,000 workers, estimated the existence of over 33,000 serious and ongoing wage violations by the city's garment industry employers, but that DIR was issuing fewer than 100 wage citations per year for all industries throughout the state. [¶] Moreover, evidence demonstrates that the resources dedicated to labor law enforcement have not kept pace with the growth of the economy in California." (Assembly Com. on Labor and Employment, Analysis of Sen. Bill No. 796 (Reg.Sess. 2003–2004) as amended July 2, 2003, p. 4.)

*Iskanian*, 59 Cal. 4th at 379. To compensate for the lack of "[a]dequate financing of essential labor law enforcement functions," the legislature enacted the PAGA to permit aggrieved employees to act as private attorneys general to collect civil penalties for violations of the Labor Code. 2003

Cal. Stat. ch. 906 § 1(d). Labor Code section 2699(a) provides:

> any provision of [the Labor Code] that provides for a civil penalty to be assessed and collected by the Labor and Workforce Development Agency or any of its departments, divisions, commissions, boards, agencies, or employees, for a violation of this code, may, as an alternative, be recovered through a civil action brought by an aggrieved employee on behalf of himself or herself and other current or former employees . . . .

Seventy-five percent of the civil penalties recovered by aggrieved employees[3] under the PAGA are distributed to the Labor and Workforce Development Agency, while the remainder is distributed to the aggrieved employees. Cal. Lab. Code § 2699(i).[4]

---

[3] An "aggrieved employee" is "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed." Cal. Lab. Code § 2699(c).

[4] Prior to bringing a PAGA action, an employee must notify the employer and the Labor and Workforce Development Agency of the specific provisions of the Labor Code alleged to have been violated. Cal. Lab. Code § 2699.3(a)(1). The Agency is required to notify the employee and employer of whether it intends to investigate the alleged violations. *Id*. § 2699.3(a)(2)(A). An aggrieved employee may commence an action if he receives notice that the Agency does not intend to investigate the alleged violations, or if he does not receive notice from the Agency within 33 days of notifying the Agency and the employer. *Id*. An employee may also bring a PAGA action if the Agency investigates the alleged violations and does not issue a citation to the employer within a specified period of time. *Id*. § 2699.3(a)(2)(B).

Pre-dispute agreements to waive PAGA claims are unenforceable under California law. In *Iskanian v. CLS Transportation Los Angeles, Inc.*, the California Supreme Court held that two state statutes prohibited the enforcement of PAGA waivers. 59 Cal. 4th at 382–83. The first, California Civil Code §1668, codifies the general principle that agreements exculpating a party for violations of the law are unenforceable.[5] The *Iskanian* court observed that allowing employees to waive the right to bring PAGA actions would "disable one of the primary mechanisms for enforcing the Labor Code." *Id*. at 383. It reasoned that "[b]ecause such an agreement has as its 'object, . . . indirectly, to exempt [the employer] from responsibility for [its] own . . . violation of law,' it is against public policy and may not be enforced." *Id*. (alterations in original) (quoting Cal. Civ. Code § 1668). The *Iskanian* court also found that agreements waiving the right to bring PAGA actions violated California Civil Code § 3513. *Id*. Civil Code § 3513 codifies the general principle that a law established for a public reason may not be contravened by private agreement.[6] The court reasoned that "agreements requiring the waiver of PAGA rights would harm the state's interests in enforcing the Labor Code and in receiving the proceeds of civil penalties used to deter violations." *Id*.

---

[5] California Civil Code §1668 provides that "[a]ll contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

[6] California Civil Code § 3513 provides that "[a]ny one may waive the advantage of a law intended solely for his benefit. But a law established for a public reason cannot be contravened by a private agreement."

Agreements waiving the right to bring "representative" PAGA claims–that is, claims seeking penalties for Labor Code violations affecting other employees–are also unenforceable under California law. In *Iskanian*, the court held that even if the PAGA authorized purely "individual" claims,[7] an agreement to waive representative PAGA claims would be unenforceable. *Id*. at 384. The court observed that individual PAGA claims do not "result in the penalties contemplated under the PAGA to punish and deter employer practices that violate the rights of numerous employees under the Labor Code." *Id*. (quoting *Brown v. Ralphs Grocery Co.*, 197 Cal. App. 4th 489, 502 (Ct. App. 2011)).

## II. The Federal Arbitration Act Does Not Preempt the *Iskanian* Rule

If the *Iskanian* rule is valid, Sakkab's waiver of his right to bring a  representative PAGA action is unenforceable. Therefore, this case turns on whether the FAA, 9 U.S.C. § 2 *et seq*., preempts the *Iskanian* rule. We conclude that it does not.

"The FAA was enacted in 1925 in response to widespread judicial hostility to arbitration agreements." *Concepcion*, 131 S. Ct. at 1745. Section 2 is the "primary substantive provision of the Act." *Id*. (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). It provides:

> A written provision in any maritime transaction or a contract evidencing a

---

[7] The court declined to decide whether the PAGA authorizes purely "individual" claims. *Iskanian*, 59 Cal. 4th at 384.

transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. While "[t]he FAA contains no express pre-emptive provision" and does not "reflect a congressional intent to occupy the entire field of arbitration," *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 477 (1989), it preempts state law "to the extent that it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,'" *id*. (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). The final clause of § 2, its saving clause, "permits agreements to arbitrate to be invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability,' but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Concepcion*, 131 S. Ct. at 1746 (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)); *see also Marmet Health Care Ctr., Inc. v. Brown*, 132 S. Ct. 1201, 1204 (2012). Even if a state-law rule is "generally applicable," it is preempted if it conflicts with the FAA's objectives. *Concepcion*, 131 S. Ct. at 1748.

### A.  The *Iskanian* Rule is a Ground for the Revocation of Any Contract

To fall within the ambit of § 2's saving clause, the *Iskanian* rule must be a "ground[] . . . for the revocation of *any contract*."  9 U.S.C. § 2 (emphasis added).  We conclude that it is.

The Supreme Court has clarified that a state contract defense must be "generally applicable" to be preserved by § 2's saving clause.  *Concepcion*, 131 S. Ct. at 1746.  It is well established that the FAA preempts state laws that single out arbitration agreements for special treatment.  *See, e.g.*, *Doctor's Assocs.*, 517 U.S. at 687.  At minimum, then, § 2's "any contract" language requires that a state contract defense place arbitration agreements on equal footing with non-arbitration agreements.  *See id*.  The *Iskanian* rule complies with this requirement.  The rule bars any waiver of PAGA claims, regardless of whether the waiver appears in an arbitration agreement or a non-arbitration agreement.

Some of our cases can be read to suggest that the phrase "any contract" in § 2's saving clause requires that a defense apply generally to all *types* of contracts, in addition to requiring that the defense apply equally to arbitration and non-arbitration agreements.  *See Ting v. AT&T*, 319 F.3d 1126, 1147–48 (9th Cir. 2003) (holding that California's Consumer Legal Remedies Act, Cal. Civ. Code § 1751, is "not a law of 'general applicability'" within the ambit of § 2's saving clause because it applies only to noncommercial consumer contracts); *Bradley v. Harris Research, Inc.*, 275 F.3d 884, 890 (9th Cir. 2001) (holding that California Business & Professions Code § 20040.05 does not apply to "any contract" because it "applies only to forum selection

clauses and only to franchise agreements").**8**    However, the Court's decision in *AT&T Mobility, LLC v. Concepcion*, 131 S. Ct. 1740, cuts against this construction of the saving clause.    The Court in *Concepcion* held that the FAA preempted California law providing that class action waivers in certain consumer contracts of adhesion were unconscionable and unenforceable.  131 S. Ct. at 1748–53. Even though the state-law rule at issue only applied to a narrow class of consumer contracts, the Court strongly implied that the rule was a "generally applicable contract

---

**8** The reasoning of these cases was based on an ambiguous passage in *Southland Corp. v. Keating*, 465 U.S. 1, 16 n.11 (1984).  The Court in *Southland* held that § 2 preempted a provision of California's Franchise Investment Law, Cal. Corp. Code § 31512 (1977), as applied to arbitration agreements.  *Id*. at 10.  In a partial dissent, Justice Stevens argued that the law was preserved by § 2 as a "ground[] . . . at law or in equity for the revocation of any contract."  *Id*. at 18–20 (Stevens, J., concurring in part and dissenting in part).  The majority rejected this argument.  It reasoned that "the defense to arbitration found in the California Franchise Investment Law is not a ground that exists at law or in equity 'for the revocation of *any* contract' but merely a ground that exists for the revocation of arbitration provisions in contracts subject to the California Franchise Investment Law."  *Id*. at 16 n.11.

Cases following *Southland* appear to clarify that § 2's "any contract" language refers to whether a state law places arbitration agreements on equal footing with non-arbitration agreements, not whether it applies to all types of contracts.  *See Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987) ("A court may not  . . . construe [an arbitration] agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law.");  *Doctor's Assocs.*, 517 U.S. at 686–87 ("States may not . . . decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause. . . . [T]hat kind of policy would place arbitration clauses on an unequal 'footing,' directly contrary to the [FAA]'s language and Congress's intent." (quoting *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 281 (1995))).

defense[].” *See id*. at 1748. The Court held that the rule was preempted because it conflicted with the purposes of the FAA, even though the rule purported to apply to “any contract.” *See id.* (“Although § 2’s saving clause preserves generally applicable contract defenses, nothing in it suggests an intent to preserve state-law rules that stand as an obstacle to the accomplishment of the FAA’s objectives.”).

Following the logic of *Concepcion*, we conclude that the *Iskanian* rule is a “generally applicable” contract defense that may be preserved by § 2’s saving clause, provided it does not conflict with the FAA’s purposes.

### B. The *Iskanian* Rule Does Not Conflict with the FAA’s Purposes

We turn now to whether the *Iskanian* rule conflicts with the FAA’s purposes. We apply ordinary conflict preemption principles to determine whether a state-law rule conflicts with a federal statute containing a saving clause. *See Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 870–72 (2000). In determining whether a state law is impliedly preempted, “[t]he purpose of Congress is the ultimate touchstone.” *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (alteration in original) (quoting *Retail Clerks Int’l Ass’n, Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96, 103 (1963)). “What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects . . . .” *Crosby v. Nat’l Foreign Trade Council*, 530 U.S. 363, 373 (2000). In exercising our judgment, we do not write on a blank slate, for the Supreme Court has repeatedly identified the purposes of the FAA and defined the scope of FAA preemption. *See Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 283 (1995)

(O'Connor, J., concurring) (describing the Court's FAA preemption jurisprudence as "an edifice of [the Court's] own creation"). After considering the objectives of the FAA, we conclude that the *Iskanian* rule does not conflict with those objectives, and is not impliedly preempted.[9]

### 1. The FAA's Purpose to Overcome Judicial Hostility to Arbitration

The Supreme Court has stated that Congress enacted the FAA to "overrule the judiciary's longstanding refusal to enforce agreements to arbitrate and to place such agreements upon the same footing as other contracts." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 302 (2010) (quoting *Volt*, 489 U.S. at 478). The FAA therefore preempts state laws prohibiting the arbitration of specific types of claims. *See, e.g.*, *Marmet*, 132 S. Ct. at 1203; *Preston v. Ferrer*, 552 U.S. 346, 356–59 (2008). The Amici Curiae argue that the *Iskanian* rule conflicts with the FAA's purpose to overcome judicial hostility to arbitration because it prohibits outright the arbitration of "individual" PAGA claims. We reject this argument.

The California Supreme Court's decision in *Iskanian* expresses no preference regarding whether individual PAGA claims are litigated or arbitrated. It provides only that

---

[9] We reject Sakkab's contention that the PAGA waiver is invalid because it bars the assertion of statutory rights under *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304 (2013), and *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614 (1985). "The 'effective vindication' exception, which permits the invalidation of an arbitration agreement when arbitration would prevent the 'effective vindication' of a federal statute, does not extend to state statutes." *Ferguson v. Corinthian Colls., Inc.*, 733 F.3d 928, 936 (9th Cir. 2013).

representative PAGA claims may not be waived outright. 59 Cal. 4th at 384.  The *Iskanian* rule does not prohibit the arbitration of any type of claim.

### 2. The FAA's Purpose to Ensure Enforcement of the Terms of Arbitration Agreements

The Supreme Court has stated that "[t]he 'principal purpose' of the FAA is to 'ensur[e] that private arbitration agreements are enforced according to their terms.'" *Concepcion*, 131 S. Ct. at 1748 (second alteration in original) (quoting *Volt*, 489 U.S. at 478).  The Court has also stated that the FAA embodies "a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary."  *Id*. at 1749 (quoting *Moses H. Cone*, 460 U.S. at 24).  The *Iskanian* rule does not conflict with these purposes.

Read broadly, these statements of the FAA's purposes would require strict enforcement of all terms contained in an arbitration agreement, including terms that are unenforceable under generally applicable state law.  Such a broad construction of the FAA's purposes is untenable, of course, because it would render § 2's saving clause wholly "ineffectual." *See Geier*, 529 U.S. at 870; *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n.12 (1967) ("As the 'saving clause' in § 2 indicates, the purpose of Congress in 1925 was to make arbitration agreements as enforceable as other contracts, but not more so.").  Congress plainly did not intend to preempt all generally applicable state contract defenses, only those that "interfere[] with arbitration," *Concepcion*, 131 S. Ct. at 1750.

A defense interferes with arbitration if, for example, it prevents parties from selecting the procedures they want applied in arbitration. *See id*. at 1748–53. *Concepcion* illustrates how a generally applicable contract defense might do so. The California rule at issue in *Concepcion*, which provided that class action waivers in certain consumer contracts of adhesion were unconscionable, did not explicitly discriminate against arbitration. *See id*. at 1745. As applied to arbitration agreements, however, the rule "interfere[ed] with fundamental attributes of arbitration," *id*. at 1748, by imposing formal classwide arbitration procedures on the parties against their will. *Id*. at 1750–51. As the Court explained,

> "In bilateral arbitration, parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes." But before an arbitrator may decide the merits of a claim in classwide procedures, he must first decide, for example, whether the class itself may be certified, whether the named parties are sufficiently representative and typical, and how discovery for the class should be conducted.

*Id.* at 1751 (citation omitted) (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010)). The Court observed that "the switch from bilateral to class arbitration sacrifices the principal advantage of arbitration–its informality–and makes the process slower, more costly, and more likely to generate procedural morass than final

judgment." *Id*. The parties could not opt out of the formal procedures of class arbitration because the procedures were required to protect the due process rights of absent parties. *Id*. Therefore, although the California rule prohibiting class action waivers applied equally to both arbitration agreements and non-arbitration agreements, it could not be applied to arbitration agreements without interfering with parties' freedom to select informal procedures.

The *Iskanian* rule prohibiting waiver of representative PAGA claims does not diminish parties' freedom to select informal arbitration procedures. To understand why, it is essential to examine the "fundamental[]" differences between PAGA actions and class actions. *See Baumann v. Chase Inv. Servs. Corp.*, 747 F.3d 1117, 1123 (9th Cir. 2014) (quoting *McKenzie v. Fed. Express Corp.*, 765 F. Supp. 2d 1222, 1233 (C.D. Cal. 2011)). The class action is a procedural device for resolving the claims of absent parties on a representative basis. *See* Fed. R. Civ. P. 23; *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 832–33 (1999); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613–17 (1997). By contrast, a PAGA action is a statutory action in which the penalties available are measured by the number of Labor Code violations committed by the employer. An employee bringing a PAGA action does so "as the proxy or agent of the state's labor law enforcement agencies," *Iskanian*, 59 Cal. 4th at 380 (quoting *Arias v. Superior Court*, 46 Cal. 4th 969, 986 (2009)), who are the real parties in interest, *see id*. at 382. As the state's proxy, an employee-plaintiff may obtain civil penalties for violations committed against absent employees, Cal. Lab. Code § 2699(g)(1), just as the state could if it brought an enforcement action directly. However, by obtaining such penalties, the employee-plaintiff does not vindicate absent employees' claims, for the PAGA does not give absent

employees any substantive right to bring their "own" PAGA claims. *See Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court*, 46 Cal. 4th 993, 1003 (2009); *see also Iskanian*, 59 Cal. 4th at 381 (explaining that "[t]he civil penalties recovered on behalf of the state under the PAGA are distinct from the statutory damages to which employees may be entitled in their individual capacities"). An agreement to waive "representative" PAGA claims–that is, claims for penalties arising out of violations against other employees–is effectively an agreement to limit the penalties an employee-plaintiff may recover on behalf of the state.

Because a PAGA action is a statutory action for penalties brought as a proxy for the state, rather than a procedure for resolving the claims of other employees, there is no need to protect absent employees' due process rights in PAGA arbitrations. *Compare Concepcion*, 131 S. Ct. at 1751–52 (observing "it is . . . odd to think that an arbitrator would be entrusted with ensuring that third parties' due process rights are satisfied"), *with Arias*, 46 Cal. 4th at 984–87. PAGA arbitrations therefore do not require the formal procedures of class arbitrations. *See Baumann*, 747 F.3d at 1123.[10]

---

[10] A judgment in a PAGA action binds absent employees because it binds the government agency tasked with enforcing the labor laws. *Arias*, 46 Cal. 4th at 986. As the California Supreme Court has explained,

> [w]hen a government agency is authorized to bring an action on behalf of an individual or in the public interest, and a private person lacks an independent legal right to bring the action, a person who is not a party but who is represented by the agency is bound by the judgment as though the person were a party.

> Unlike Rule 23(c)(2), PAGA has no notice requirements for unnamed aggrieved employees, nor may such employees opt out of a PAGA action. In a PAGA action, the court does not inquire into the named plaintiff's and class counsel's ability to fairly and adequately represent unnamed employees—critical requirements in federal class actions under Rules 23(a)(4) and (g). . . . Moreover, unlike Rule 23(a), PAGA contains no requirements of numerosity, commonality, or typicality.

*Id.* at 1122–23 (citations omitted). Because representative PAGA claims do not require any special procedures, prohibiting waiver of such claims does not diminish parties' freedom to select the arbitration procedures that best suit their needs. Nothing prevents parties from agreeing to use informal procedures to arbitrate representative PAGA claims. This is a critically important distinction between the *Iskanian* rule and the rule at issue in *Concepcion*.

The dissent emphasizes that both the *Iskanian* rule and the rule at issue in *Concepcion* "interfere[] with the parties' freedom to limit their arbitration only to those claims arising between the contracting parties." We do not read *Concepcion* to require the enforcement of all waivers of representative claims in arbitration agreements. Whether a claim is technically denominated "representative" is an imperfect proxy for whether refusing to enforce waivers of that claim

---

*Id.* Since the aggrieved employee bringing the action "does so as the proxy or agent of the state's labor law enforcement agencies," absent employees are also bound by any judgment regarding civil penalties. *Id.*

will deprive parties of the benefits of arbitration.[11]  Instead, *Concepcion* requires us to examine whether the waived claims mandate procedures that interfere with arbitration, as the class claims in *Concepcion* did.  Here, they do not.

We take the dissent's broader point to be that the *Iskanian* rule defeats the parties' contractual expectations, as expressed in their arbitration agreement. *See Concepcion*, 131 S. Ct. at 1752 ("Arbitration is a matter of contract, and the FAA requires courts to honor parties' expectations.").    We recognize that Sakkab and Luxottica likely expected the waiver of representative PAGA claims to be enforced, and that the *Iskanian* rule prevents that expectation from being fulfilled.  Any generally applicable state law that invalidates a mutually agreed upon term of an arbitration agreement will, by definition, defeat the parties' contractual expectations. However, the FAA's saving clause clearly indicates that Congress did not intend for the parties' expectations to trump any and all other interests.  As we have explained, a rule requiring that the parties' expectations be enforced in all circumstances, regardless of whether doing so conflicts with generally applicable state law, would render the saving clause wholly ineffectual.

We acknowledge that the Court in *Concepcion* also expressed concern that "class arbitration greatly increases risks to defendants" by aggregating claims and increasing the

---

[11] For example, even an "individual" PAGA claim does not arise solely between an employer and an employee.  As the court in *Iskanian* observed, "*every* PAGA action, whether seeking penalties for Labor Code violations as to only one aggrieved employee–the plaintiff bringing the action–or as to other employees as well, is a representative action on behalf of the state." *Iskanian*, 59 Cal. 4th at 387.

amount of potential damages. *Id*. at 1752. As the Court observed, arbitration is "poorly suited to the higher stakes of class litigation," because it does not provide for judicial review. *Id*. Although PAGA actions do not aggregate individual claims, they may nonetheless involve high stakes. Defendants may face hefty civil penalties in PAGA actions, and may be unwilling to forgo judicial review by arbitrating them. It does not follow, however, that the FAA preempts the *Iskanian* rule just because the amount of civil penalties the PAGA authorizes could make arbitration a less attractive method than litigation for resolving representative PAGA claims. By their nature, some types of claims are better suited to arbitration than others. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991) (recognizing that agreements to arbitrate federal statutory claims are enforceable even if they do not appear to be "appropriate for arbitration"). But the FAA would not preempt a state statutory cause of action that imposed substantial liability merely because the action's high stakes would arguably make it poorly suited to arbitration. *Cf. Medtronic*, 518 U.S. at 485 ("[B]ecause the states are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action."). Nor, we think, would the FAA require courts to enforce a provision limiting a party's liability in such an action, even if that provision appeared in an arbitration agreement. *Cf. Booker v. Robert Half Int'l, Inc.*, 413 F.3d 77, 83 (D.C. Cir. 2005) (assuming, without deciding, that a term in an arbitration agreement barring punitive damages was unenforceable as applied to a claim under the District of Columbia Human Rights Act). The FAA contemplates that parties may simply agree *ex ante* to litigate high-stakes claims if they find arbitration's informal procedures unsuitable. By the same token, the FAA does not

require courts to enforce agreements to waive the right to bring representative PAGA actions just because the amount of penalties an aggrieved employee is authorized to recover for the state makes the formal procedures of litigation more attractive than arbitration's informal procedures. Just as the high stakes involved in antitrust actions may cause parties to agree *ex ante* to exclude antitrust claims from arbitration, parties may prefer to litigate representative PAGA claims.

It is true that PAGA actions, like many causes of action, can be complex. It is not true, however, that PAGA actions are necessarily "procedurally" complex, as the dissent claims. Rather, the potential complexity of PAGA actions is a direct result of how an employer's liability is measured under the statute. The amount of penalties an employee may recover is measured by the number of violations an employer has committed, and the violations may involve multiple employees. "[P]otential complexity should not suffice to ward off arbitration," *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 633 (1985), where, as here, the complexity flows from the substance of the claim itself, rather than any procedures required to adjudicate it (as with class actions). *Cf. id*. (holding that an agreement to arbitrate antitrust claims was enforceable).

The dissent argues that representative PAGA actions will make the arbitration process "slower" and "more costly." There is no support for this conclusion in the record. *Cf. Concepcion*, 131 S. Ct. at 1751 (citing American Arbitration Association statistics regarding the duration of class arbitrations). Moreover, even if there were evidence that representative PAGA actions take longer or cost more to arbitrate than other types of claims, the same could be said of any complex or fact-intensive claim. Antitrust claims, for

example, have the potential to make arbitration slower and more costly. This does not mean that a rule declining to enforce waivers of such claims interferes with the FAA in any meaningful sense, since, unlike class claims, parties are free to arbitrate them using the procedures of their choice. In many ways, arbitration is well suited to resolving complex disputes, provided that the parties are free to decide how the arbitration will be conducted. *See id*.; *see also* American Arbitration Association Commercial Arbitration Rules (describing separate procedures for "Large, Complex, Commercial Disputes").

The dissent also argues that representative PAGA claims are "more likely to generate procedural morass." But whether arbitration of representative PAGA actions is likely to "generate procedural morass" depends, first and foremost, on the procedures the parties select. One way parties may streamline the resolution of complex PAGA claims is by agreeing to limit discovery in arbitration. *See Dotson v. Amgen, Inc.*, 181 Cal. App. 4th 975, 983 (Ct. App. 2010) (observing that "arbitration is meant to be a streamlined procedure. Limitations on discovery, including the number of depositions, is one of the ways streamlining is achieved"). California courts have recognized that "discovery limitations are an integral and permissible part of the arbitration process." *Id*. (citing *Armendariz v. Found. Health Psychcare Servs., Inc.*, 24 Cal. 4th 83, 106 n.11 (2000)); *see also Roman v. Superior Court*, 172 Cal. App. 4th 1462, 1476 (Ct. App. 2009). Notably, California law permits parties to arbitrate under the American Arbitration Association's employment dispute resolution rules. *See Roman*, 172 Cal. App. 4th at 1476. The rules give arbitrators broad authority to decide how much discovery is appropriate, "consistent with the expedited nature of arbitration." *See* American Arbitration

Association Employment Arbitration Rules and Mediation Procedures (2009), at 19.

Of course, whether representative PAGA claims are likely to "generate procedural morass" will also depend on whether, and to what extent, state law purports to limit parties' right to use informal procedures, including limited discovery, in representative PAGA arbitrations. It is conceivable that a state law imposing such limits could run afoul of the Court's decision in *Concepcion* by requiring a degree of formality that is inconsistent with traditional arbitration procedures. *See Concepcion*, 131 S. Ct. at 1751. No such state law is before us, however, and it is premature to conclude that representative PAGA claims will necessarily result in "procedural morass" when there is no indication that state law limits parties' freedom to select informal procedures, or limit discovery, in PAGA arbitrations. *Cf. Williams v. Superior Court*, 236 Cal. App. 4th 1151, 1156–58 (Ct. App. 2015) (upholding trial court's refusal to order statewide discovery in a PAGA action and observing that "[p]laintiff's proposed procedure, which contemplates jumping into extensive statewide discovery based only on the bare allegations of one local individual having no knowledge of the defendant's statewide practices would be a classic use of discovery tools to wage litigation rather than facilitate it").

In sum, the *Iskanian* rule does not conflict with the FAA, because it leaves parties free to adopt the kinds of informal procedures normally available in arbitration. It only prohibits them from opting out of the central feature of the PAGA's private enforcement scheme–the right to act as a private attorney general to recover the full measure of penalties the state could recover.

Our conclusion that the FAA does not preempt the *Iskanian* rule is bolstered by the PAGA's central role in enforcing California's labor laws. The Court has instructed that "[i]n all pre-emption cases" we must "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic*, 518 U.S. at 485 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)); *see also Arizona v. United States*, 132 S. Ct. 2492, 2503 (2012) (considering historic police powers of the State in analyzing obstacle preemption). "States possess broad authority under their police powers to regulate the employment relationship to protect workers within the State." *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985) (quoting *DeCanas v. Bica*, 424 U.S. 351, 356 (1976)).

Both the PAGA statute and the *Iskanian* rule reflect California's judgment about how best to enforce its labor laws. "[T]he Legislature's purpose in enacting the PAGA was to augment the limited enforcement capability of the Labor and Workforce Development Agency by empowering employees to enforce the Labor Code as representatives of the Agency." *Iskanian*, 59 Cal. 4th at 383. And the "sole purpose" of the *Iskanian* rule "is to vindicate the Labor and Workforce Development Agency's interest in enforcing the Labor Code." *Id*. at 388–89. The explicit purpose of the rule barring enforcement of agreements to waive representative PAGA claims is to preserve the deterrence scheme the legislature judged to be optimal. *See id*. at 384.

As the California Supreme Court has explained, a PAGA action is a form of qui tam action. *See id*. at 382. Qui tam actions predate the FAA by several centuries. *See Vermont*

*Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773–76 (2000).  The FAA was not intended to preclude states from authorizing qui tam actions to enforce state law.  Nor, we think, was it intended to require courts to enforce agreements that severely limit the right to recover penalties for violations that did not directly harm the party bringing the action.  The right to inform the state of violations that did not injure the informer is the very essence of a qui tam action.  *See id*. at 775.  That qui tam actions can be difficult to arbitrate does not mean that the FAA requires courts to enforce private agreements opting out of the state's chosen method of enforcing its labor laws.

## III.    Severability of the PAGA Waiver

Sakkab has not argued that the PAGA waiver contained in the arbitration agreement rendered the entire arbitration agreement void.  Nor has he disputed that he is required to arbitrate the four non-PAGA claims in the FAC.  It is therefore clear that the non-PAGA claims in the FAC must be arbitrated.

We have held that the waiver of Sakkab's representative PAGA claims may not be enforced.  It is unclear, however, whether the parties have agreed to arbitrate such surviving claims or whether they must be litigated instead.[12]  Accordingly, we reverse the district court's order dismissing the FAC, and return the issue to the district court and the parties to decide in the first instance where Sakkab's representative PAGA claims should be resolved, and to

---

[12] We note that the dispute resolution agreement provides that Luxottica "expressly does not agree to arbitrate any claim on a . . . representative basis."

conduct such other proceedings as are consistent with this opinion.

**REVERSED and REMANDED.**

N.R. SMITH, dissenting:

In 1925, "Congress enacted the [Federal Arbitration Act] in response to widespread judicial hostility to arbitration." *Am. Express Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2308–09 (2013). Despite ninety years of Supreme Court precedent invalidating state laws deemed hostile to arbitration, the majority today displays this same "judicial hostility" to arbitration agreements. Our court employed the same "judicial hostility" in *Laster v. AT&T Mobility LLC*, 584 F.3d 849 (9th Cir. 2009), *rev'd sub nom. AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 131 S. Ct. 1740 (2011), for which we were subsequently reversed.

In this case, rather than upholding the purposes of the Federal Arbitration Act ("FAA"), the majority upholds a "judicially created" state rule that prevents parties to an arbitration agreement from agreeing that their future arbitration will address individual claims arising between one employee and one employer. To conclude that the state rule (created by *Iskanian v. CLS Transp. Los Angeles, LLC*, 327 P.3d 129 (Cal. 2014)) does not frustrate the purposes of the FAA, the majority ignores the basic precepts enunciated in *Concepcion*. Because the majority should have applied *Concepcion* and deferred to the FAA's "liberal federal policy favoring arbitration," *Moses H. Cone Mem'l Hosp. v.*

*Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), rather than circumventing it, I must dissent.

## I.  Concepcion

Because the majority essentially ignores the Supreme Court's direction in *Concepcion* (a case very similar in detail to this case), I begin by describing this important precedent in some detail.

In *Concepcion*, a consumer contract provided for "arbitration of all disputes between the parties, but required that claims be brought in the parties' individual capacity, and not as a plaintiff or class member in any purported class or representative proceedings."  131 S. Ct. at 1744 (internal quotation marks omitted).  Relying on the California Supreme Court's decision in *Discover Bank v. Superior Court*, 113 P.3d 1100 (Cal. 2005), *abrogated by AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011), which established a rule that invalidated class action waivers in contracts of adhesion, a federal district court "found that the arbitration provision was unconscionable."  *Concepcion*, 131 S. Ct. at 1745.  We affirmed, holding that the *Discover Bank* rule was not preempted by the FAA, because it was simply "a refinement of the unconscionability analysis applicable to contracts generally in California."  *Id.*  Further, we rejected AT&T's argument that "class proceedings will reduce the efficiency and expeditiousness of arbitration."  *Id.*

The Supreme Court reversed and concluded that a rule "[r]equiring the availability of classwide arbitration interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA."  *Id.* at 1748.  The Court held that, despite § 2's savings clause, even generally

applicable contract defenses can violate the FAA if they serve as an obstacle to the objectives of the FAA. *Id.* The Court also identified the appropriate inquiry: If the state rule "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," the rule is preempted. *Id*. at 1753. As part of that inquiry, the Court clarified the purpose and objective of the FAA. "The overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *Id.* at 1748.

The Court then applied that analysis to the *Discover Bank* rule prohibiting the class action waivers. The Court explained that "arbitration is a matter of contract," *id.* at 1745, and "[a]lthough the [*Discover Bank* ] rule does not *require* classwide arbitration, it allows any party to a consumer contract to demand it *ex post*," *id.* at 1750. Thus, rather than holding the parties to the terms of bilateral arbitration agreed upon in their contract, the *Discover Bank* rule allowed any party to subject the other to class-action arbitration. *Id.* The Court reasoned that "class arbitration, to the extent it is manufactured by *Discover Bank* rather than consensual, is inconsistent with the FAA." *Id.* at 1750–51.

The Court then provided three reasons why *ex post*, state-mandated class arbitration worked as an obstacle to the FAA's purposes and objectives. First, "the switch from bilateral to class arbitration sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment." *Id.* at 1751. The Court explained that "[i]n bilateral arbitration, parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs,

greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes." *Id.* (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 685 (2010)). Because of the complex nature of class litigation, those benefits are lost when parties are forced to pursue class arbitration rather than the bilateral arbitration to which the parties agreed in their agreement. *See Concepcion*, 131 S. Ct. at 1751.

Second, the Court reasoned that "class arbitration *requires* procedural formality." *Id.* "For a class-action money judgment to bind absentees in litigation, class representatives must at all times adequately represent absent class members, and absent members must be afforded notice, an opportunity to be heard, and a right to opt out of the class." *Id.* (citing *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811–12 (1985)). The Court found it unlikely that Congress, when passing the FAA, envisioned requiring such complex procedural requirements in an arbitration context. *Id.* at 1751–52.

Third, "class arbitration greatly increases risks to defendants." *Id.* at 1752. The Court explained:

> Informal procedures do of course have a cost: The absence of multilayered review makes it more likely that errors will go uncorrected. Defendants are willing to accept the costs of these errors in arbitration, since their impact is limited to the size of individual disputes, and presumably outweighed by savings from avoiding the courts. But when damages allegedly owed to tens of thousands of potential claimants are aggregated and

> decided at once, the risk of an error will often become unacceptable. Faced with even a small chance of a devastating loss, defendants will be pressured into settling questionable claims. . . . Arbitration is poorly suited to the higher stakes of class litigation. . . . We find it hard to believe that defendants would bet the company with no effective means of review, and even harder to believe that Congress would have intended to allow state courts to force such a decision.

*Id.*

After presenting these three reasons why *ex post*, state-mandated class arbitration worked as an obstacle to the objectives of the FAA, the Court addressed the argument that class arbitration was "necessary to prosecute small-dollar claims that might otherwise slip through the legal system." *Id.* at 1753. The Court rejected the argument, reasoning that "States cannot require a procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons." *Id.* Thus, the Court concluded that "[b]ecause 'it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' California's *Discover Bank* rule is preempted by the FAA." *Id.* (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

## II. FAA's preemption of the Iskanian rule

The majority cannot distinguish the present case from the principles outlined in *Concepcion*. *Concepcion* dealt with a state rule that prohibited class-action waivers in arbitration agreements. The present case involves a state rule that

prohibits representative action waivers in arbitration agreements.

The *Discover Bank* rule and the *Iskanian* rule are sufficiently analogous to guide our decision.[1] Class actions and PAGA actions both allow an individual (who can normally only raise his or her own individual claims) to bring an action on behalf of other people or entities. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (reasoning that "[t]he class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979)); *Arias v. Superior Court*, 209 P.3d 923, 986 (Cal. 2009) (explaining that an aggrieved employee suing under PAGA "does so as the proxy or agent of the state's labor law enforcement agencies" and a judgment binds the state law enforcement agencies and

---

[1] The majority spends a significant portion of its decision discussing whether *Iskanian*'s rule is a "generally applicable contract defense." *See Concepcion*, 131 S. Ct. at 1746 (quoting *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996)). However, the parties do not address the issue of whether the *Iskanian* rule is a generally applicable contract defense. Therefore, I do not address the issue (although (a) I have serious doubts that the rule established by *Iskanian* falls into the same category as the common law contract defenses of duress or fraud, and (b) the Supreme Court did not determine in *Concepcion* whether the alleged unconscionability of failing to apply the *Discover Bank* rule was a generally applicable contract defense). Further, declaring that the *Iskanian* rule is a "generally applicable contract defense" does not help the majority. Under *Concepcion*, even generally applicable contract defenses may be preempted if they "stand as an obstacle to the accomplishment of the FAA's objectives." *Id.* at 1748. The *Iskanian* rule stands as such an obstacle to "[t]he overarching purpose of the FAA . . . to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *Id.*

nonparty aggrieved employees). Likewise, *waivers* of class actions and representative actions both seek to prevent the parties from raising claims on behalf of others by limiting arbitration to only those claims arising between the parties to the agreement.

Because the class action and representative action waivers fulfill the same purpose, it should be no surprise that they are often (if not always) grouped together and use similar language.[2] The common inclusion of both class action and representative waivers in arbitration agreements indicates that one waiver, without the other, would not be sufficient to create the type of arbitration desired by the parties. For example, an arbitration agreement that includes a class waiver without including a representative waiver would not effectively limit the arbitration to only individual claims arising between the parties to the agreement. Thus, both the *Discover Bank* rule and *Iskanian* rule (by invalidating these waivers) act to prevent contracting parties from crafting arbitration agreements in a way that limits the arbitration to claims arising solely between the contracting parties.[3]

---

[2] In *Concepcion*, the arbitration agreement required claims to be brought in the parties' "individual capacity, and not as a plaintiff or class member in any purported class or representative proceeding." *Concepcion*, 131 S. Ct. at 1744. Here, Sakab's arbitration agreement requires that he will not "file (or join, participate or intervene in) a class-based lawsuit, court case or arbitration (including any collective or representative arbitration claim)." Both waivers expressly prohibited both class and representative actions.

[3] The majority responds by claiming that this argument would require courts to enforce all waivers of representative claims, including individual claims in a representative capacity, in arbitration agreements. However, this argument regarding individual claims in a representative capacity again is not relevant to the facts at hand. Sakkab was given the right to

The majority emphasizes the differences between class actions and PAGA claims.  But differences between the two types of actions, no matter how plentiful the majority would want to characterize them, do not change the fact that a rule prohibiting the waiver of either type of action in an arbitration agreement interferes with the parties' freedom to limit their arbitration only to those claims arising between the contracting parties.  The majority recognizes that one of the key problems with the *Discover Bank* rule in *Concepcion* was that "it could not be applied to arbitration agreements without interfering with *parties' freedom* to select informal procedures" for their own arbitrations.   Maj. Op. at 20 (emphasis added).  In an attempt to apply that principle to the *Iskanian* rule, the majority reasons that "the *Iskanian* rule does not conflict with the FAA, because *it leaves parties free to adopt the kinds of informal procedures normally available in arbitration.*"  Maj. Op. at 27 (emphasis added).  However, the majority's reasoning overlooks the simple fact that, by preventing parties from limiting arbitration only to individual claims arising between the two contracting parties, the *Iskanian* rule interferes with the parties' freedom to craft arbitration in a way that preserves the informal procedures and simplicity of arbitration (just as did the *Discover Bank* rule).  By requiring the availability of representative PAGA claims in arbitration (i.e., claims not specific to the contracting parties), the *Iskanian* rule interferes with the fundamental attributes of arbitration and thus creates a

pursue his individual PAGA claim in this arbitration.  His employer did not object to Sakkab pursuing such an individual claim.  Sakkab refused, instead pursuing the broader claim at issue here.  That said, when parties contractually agree to waive any representative claims in an arbitration agreement and a state rule mandates a different decision, an analysis under *Concepcion* is warranted.

scheme inconsistent with the FAA.  *See Concepcion*, 131 S. Ct. at 1748.

Because the effect of the waivers before challenged in *Concepcion* and now challenged in this case are similar, the analytic framework and reasoning in *Concepcion* is directly applicable.  Just like the *Discover Bank* rule in *Concepcion*, the *Iskanian* rule does not *require* the parties to arbitrate representative PAGA claims.   However, by invalidating representative waivers in an arbitration agreement (as applied to PAGA claims), the rule allows any party to an employment contract to demand arbitration of a representative PAGA claim *ex post*, despite the fact that the parties agreed to forgo such a demand in the agreement, where the parties have already agreed to waive all other forums.  *See id.* at 1750.  As explained below, by (a) preventing parties from crafting arbitration agreements to limit the arbitration only to individual claims and (b) allowing *ex post* demand for the arbitration of representative PAGA actions, the *Iskanian* rule forces the parties to lose the benefits of arbitration and frustrates the purposes of the FAA.   The *Iskanian* rule burdens arbitration in the same three ways identified in *Concepcion*: it makes the process slower, more costly, and more likely to generate procedural morass; it requires more formal and complex procedure; and it exposes the defendants to substantial unanticipated risk.  *See id.* at 1751–52.

> A.  *The* Iskanian *rule makes arbitration slower, more costly, and more likely to generate procedural morass*.

First, the switch from the arbitration of only individual claims to the arbitration of representative PAGA claims on behalf of the State and all other aggrieved employees

"sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass." *Concepcion*, 131 S. Ct. at 1751.[4]   When an aggrieved employee raises a representative PAGA claim, he must first show that his employer violated the California Labor Code.  If the PAGA claimant is successful in proving that his or her employer violated the Labor Code, civil penalties are assessed against the employer in the amount of "one hundred dollars ($100) for each aggrieved employee per pay period for the initial violation and two hundred dollars ($200) for each aggrieved employee per pay period for each subsequent violation."  Cal. Labor Code § 2699(f)(2).  Thus, rather than merely focusing on the individual employee, the hours he worked, and the damages due to him, an arbitrator overseeing a representative PAGA claim would have to make specific factual determinations regarding (1) the number of other employees affected by the labor code violations, and (2) the number of

---

[4] For some unknown reason, the majority states that there is no support in the record for the conclusion that representative PAGA actions will make the arbitration process "slower" and "more costly."  However, the arbitration of representative PAGA actions is clearly slower and more costly than bilateral arbitration for the reasons outlined herein (for example, the review of labor code violations and number of pay periods for affected employees will inherently be slower and more costly when brought in a representative capacity for multiple employees than the review of labor code violations and number of pay periods when brought in bilateral arbitration for a single employee).  This conclusion is not unique and is adequately reflected in the record.  Indeed, the Chamber of Commerce of the United States of America and Retail Litigation Center, Inc. filed an *amicus* brief in this case detailing how such representative claims lack "the simplicity, informality, and expedition that are characteristic of arbitration" and concluding that the arbitration of representative PAGA claims is as incompatible with arbitration as a class proceeding.

pay periods that *each* of the affected employees worked. Because of the high stakes involved in these determinations, both of these issues would likely be fiercely contested by parties.     In arbitrations involving large companies, the arbitrator would be required to make individual factual determinations regarding the employment status for hundreds or thousands of employees, none of whom are party to such arbitration.     Further, the employee who brought the representative PAGA claim would not initially have access to the information needed to prove the number of affected employees or the number of pay periods they worked. Therefore, some kind of discovery would need to take place, requiring the employer to divulge the necessary documents (potentially a tremendous number of payroll and employment forms) to the PAGA claimant.  This would not be a minor undertaking.  All of these additional tasks and procedures necessarily makes the process substantially slower, substantially more costly, and more likely to generate procedural morass than non-representative, individual arbitration.

Despite these additional procedural hurdles present in a PAGA claim, the majority denies that representative PAGA claims would make the process slower, substantially more costly, and more likely to generate procedural morass. Instead, the majority reasons that any potential complexity of PAGA claims does not render such claims incompatible with arbitration.  The majority holds that "arbitration is well suited to resolving complex disputes, *provided that the parties are free to decide how the arbitration will be conducted*."  Maj. Op. at 26.  However, that rationale ignores the problem the *Iskanian* rule creates; the parties had already decided how their arbitration would be conducted (individually, in a non-representative capacity).  The *Iskanian* rule instead allows the

employee, *ex post*, to demand arbitration of representative claims.[5]   Although two parties certainly could agree to arbitrate representative PAGA claims when they construct and sign the arbitration agreement, requiring the parties to resolve representative actions (after a contrary agreement between the parties has been struck) renders the arbitration much more complex, costly, and time consuming *than what the parties had agreed to do*.  "Arbitration is a matter of contract," and "[t]he overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms so as to facilitate streamlined proceedings." *Concepcion*, 131 S. Ct. at 1745, 1748.  When the parties have agreed to a specific, streamlined method of arbitration (such as the arbitration of individual claims only), and a relevant, state rule forces the parties to forego their chosen method of dispute resolution in favor of a procedure that is more costly and time consuming, the state rule frustrates the purposes of the FAA.  As the *Concepcion* Court explained in the class arbitration context, "The conclusion follows that class arbitration, to the extent it is manufactured by *Discover Bank* rather than consensual, is inconsistent with the FAA."  *Id.* at 1750–51.  Likewise, it follows that representative arbitration,

---

[5] The majority holds that parties could, *ex ante*, craft their arbitration agreements to deal with the complexity involved in the arbitration of representative PAGA claims.  However, *Concepcion*'s analysis was not concerned with the effect of the *Discover Bank* rule on future arbitration agreements, but instead focused on the *ex post* effect of the rule on arbitration agreements containing class waivers. *See Concepcion*, 131 S. Ct. at 1750 ("California's *Discover Bank* rule similarly interferes with arbitration.  Although the rule does not *require* classwide arbitration, it allows any party to a consumer contract to demand it *ex post*."). Therefore, we also focus on *Iskanian*'s *ex post* effect on Sakkab's arbitration agreement.

to the extent it is manufactured by *Iskanian* rather than consensual, is inconsistent with the FAA.

The majority further reasons that, even if representative PAGA actions will make the arbitration process slower or more costly, the same could be said of any complex or fact-intensive claim.  The majority compares representative PAGA actions to antitrust claims as an example of another type of claim that has the potential to make arbitration slower and more costly.  This comparison is incorrect.  Instead, the principle enumerated in *Concepcion* requires us to compare a representative PAGA claim (what the *Iskanian* rule would require) to individual, bilateral arbitration (what the parties had agreed to do in their arbitration agreement).  Had the majority conducted the correct comparison, it would be forced to conclude that the arbitration of representative PAGA claims is certainly more likely to make the process slower, substantially more costly, and more likely to generate procedural morass than non-representative, individual arbitration.

> B.  *The* Iskanian *rule requires more formal and complex procedure.*

Second, representative PAGA actions are procedurally more complex than the arbitration of solely individual claims. Specifically, the discovery required in a representative PAGA claim is vastly more complex than would be required in an individual arbitration.  In an individual arbitration, the employee already has access to all of his own employment records (or can easily obtain them from his employer).  He knows how long he has been working for the employer and can easily determine how many pay periods he has been employed.  Likewise, he knows whether he has been affected

by the Labor Code violations he is alleging and can provide individual evidence to support his claims. However, in a representative PAGA claim, the individual employee does not have access to any of this information on behalf of all the other potentially aggrieved employees. Therefore, the employee must be able to obtain the information from the employer or the other employees. The discovery necessary to obtain these documents from the employer would be significant and substantially more complex than discovery regarding only the employee's individual claims. The majority's proposed solution to this complexity, the use of hypothetical informal procedures instead of more formal ones, misses the mark. The procedural complexity present in representative PAGA claims is not attributable to the use of formal versus informal procedures. Instead, such complexity is a function of the sheer number of tasks and procedural hurdles present in bringing a representative PAGA claim.

The majority completely dismisses the procedural complexity that a representative PAGA claim entails. As the majority suggests, the arbitration of representative PAGA claims may not be as procedurally complex *as class arbitrations*. *See Concepcion*, 131 S. Ct. at 1751–52. However, (for the second time), the majority makes the wrong comparison. Instead of comparing a representative PAGA claim to individual, bilateral arbitration (i.e., what the parties had agreed to versus what the *Iskanian* rule would require, as the principle enumerated in *Concepcion* requires), the majority compares a representative PAGA claims to class arbitration and concludes that, because the two procedures are different, a representative PAGA action is not inconsistent with arbitration. Had the majority conducted the correct comparison, the majority would be forced to conclude that the

arbitration of representative PAGA claims is certainly more procedurally complex than bilateral arbitration.

The majority holds that any potential procedural complexity will depend on the arbitration procedures the parties select and that the parties may streamline complex PAGA claims by agreeing to informal procedures. However, this type of reasoning was also considered and rejected in *Concepcion*, where the plaintiff contended that because the parties could agree to informal procedures, class procedures were not necessarily incompatible with arbitration. 131 S. Ct. at 1752–53. Again, the majority fails to recognize that, although the parties could choose to employ procedures to address the complexity inherent in representative PAGA actions, they cannot be required by a state to do so. As the Court in *Concepcion* reasoned:

> The Concepcions contend that because parties may and sometimes do agree to aggregation, class procedures are not necessarily incompatible with arbitration. But the same could be said about procedures that the Concepcions admit States may not superimpose on arbitration: Parties *could* agree to arbitrate pursuant to the Federal Rules of Civil Procedure, or pursuant to a discovery process rivaling that in litigation. Arbitration is a matter of contract, and the FAA requires courts to honor parties' expectations. But what the parties in the aforementioned examples would have agreed to is not arbitration as envisioned by the FAA, lacks its benefits, and therefore may not be required by state law.

*Id.* (citation omitted).    Therefore, although parties may *choose* to employ complex discovery procedures, as would be required by a representative PAGA claim, state law cannot *demand* that they do so.  Here, Sakkab and Luxottica chose to pursue individual, non-representative arbitration.  Therefore, the *Iskanian* rule frustrates the purposes of the FAA by requiring them to undertake the procedural complexity of representative PAGA claims.

>   C. *The* Iskanian *rule exposes the defendants to substantial unanticipated risk.*

Third, the arbitration of representative PAGA claims greatly increases the risk to employers.  *See id.* at 1752. Rather than awarding damages for Labor Code violations for just one employee, representative PAGA claims award damages for all affected employees.  Cal. Labor Code § 2699(f)(2).  A representative PAGA claim could therefore increase the damages awarded in arbitration by a multiplier of a hundred or thousand times (depending on the size of the company).  Thus, the concerns expressed in *Concepcion* are just as real in the present case:

>   The absence of multilayered review makes it more likely that errors will go uncorrected. Defendants are willing to accept the costs of these errors in arbitration, since their impact is limited to the size of individual disputes, and presumably outweighed by savings from avoiding the courts.    But when damages allegedly owed to [hundreds or thousands] of potential claimants are aggregated and decided at once, the risk of an error will often become unacceptable.    Faced with even a

small chance of a devastating loss, defendants will be pressured into settling questionable claims. . . . We find it hard to believe that defendants would bet the company with no effective means of review, and even harder to believe that Congress would have intended to allow state courts to force such a decision.

*Concepcion*, 131 S. Ct. at 1752.

The majority admits that representative PAGA actions may involve high stakes, but then concludes that high stakes, alone, cannot lead to invalidation of the *Iskanian* rule and again compares PAGA actions to antitrust claims in illustrating its argument. Once again, (for the third time), the majority completely misses the point of *Concepcion* and invokes an incorrect comparison. Parties to an arbitration *could agree* to arbitrate high stakes issues. However, a state court cannot "force such a decision." *Id.* Comparing such high stakes PAGA actions to antitrust claims is not relevant. Again, the majority should have compared high stakes PAGA actions against the individual, bilateral arbitration that the parties actually agreed to undertake. When Sakkab and Luxottica entered into their arbitration agreement, they chose to limit the risk to which they were subjecting themselves to damages arising out of individual claims between the two parties. That is all. The *Iskanian* rule invalidates that decision and allows Sakkab to demand *ex post* arbitration of claims outside of that framework. *Concepcion* declared that this increased risk, to which the parties did not agree, frustrated the purposes of the FAA. When combined with the increased cost, time, and procedural complexity inherent in the arbitration of representative PAGA claims (when compared to solely individual arbitration), the increased risk

to a defendant works as yet another way that the benefits of arbitration are lost through application of the *Iskanian* rule.

   D. *The* Iskanian *rule cannot be justified on state policy grounds*.

   The majority holds that its decision "is bolstered by the PAGA's central role in enforcing California's labor laws" and that "[b]oth the PAGA statute and the *Iskanian* rule reflect California's judgment about how best to enforce its labor laws." Maj. Op. at 28. However, under *Concepcion*, "States cannot require a procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons." 131 S. Ct. at 1753. As is evidenced by our discussion of the effective vindication exception to the FAA in *Ferguson v. Corinthian Colls., Inc.*, when it comes to arbitration agreements, "'[w]e have no earthly interest (quite the contrary) in vindicating' a state law."[6] 733 F.3d 928, 936 (9th Cir. 2013) (quoting *Italian Colors Rest.*, 133 S. Ct. at 2320 (Kagan, J., dissenting)). Thus, if a state law violates or frustrates the FAA, the state law must give way, even if such a decision prevents the state's interest from being vindicated. *Ferguson*, 733 F.3d at 936–37. By relying so heavily on state policy grounds to support its decision, the majority strays awfully close to invocation of the effective vindication doctrine, which the majority admits does not apply to the present case. Therefore, because the *Iskanian* rule serves as an obstacle to

---

   [6] Sakkab argues that he cannot be denied a forum for his representative PAGA claims. However, Sakkab has no right to the vindication of a state law claim, as the majority correctly recognizes.

the objectives of the FAA, the desirability and importance of the rule to the State's policies and purposes cannot save it.[7]

Although the State's interest in an employee's ability to bring PAGA claims is ultimately irrelevant to the *Concepcion* analysis, it is important to note that preemption of the *Iskanian* rule does not preempt PAGA itself. In fact, PAGA could continue to play a meaningful role in California's labor law enforcement scheme without the *Iskanian* rule. First, any employee not subject to an arbitration agreement waiving such actions is free to bring a PAGA claim. In the present case, Luxottica gave Sakkab the option to opt out of the arbitration agreement if he simply returned the opt-out form to Luxottica within a specified period of time. We have previously reasoned that an opt out provision prevents an arbitration agreement from being a contract of adhesion, and supports the enforceability of the agreements. *See Circuit City Stores, Inc. v. Ahmed*, 283 F.3d 1198, 1199–1200 (9th Cir. 2002). Thus, employers are incentivized to include opt out provisions in their arbitration agreements. Any employees who opt out of arbitration, or whose employers do not utilize arbitration, will be free to bring PAGA claims. Second, PAGA requires that potential claimants provide notice to the State before pursuing a PAGA action. Cal. Labor Code § 2699.3. As no one has asserted that the State of California is prevented from raising the labor violations on

---

[7] The majority holds that "[t]he FAA was not intended to preclude states from authorizing qui tam actions to enforce state law." Maj. Op. at 29. However, the majority provides no support for that declaration. Under *Concepcion*, if a state rule authorizing a qui tam action frustrated the purposes or objectives of the FAA, that rule would certainly be invalidated. The majority provides no authority to support the contention that state law can preempt federal law if the state law involves qui tam actions.

its own, the notice provision of PAGA and the implementation of statutory damages for Labor Code violations can continue to provide a meaningful benefit to the State of California. Finally, inasmuch as a PAGA claim can be limited to damages stemming from a single employee's employment, PAGA continues to provide an opportunity for individuals to collect damages on behalf of the State, even in arbitration. Luxottica has expressly argued that an "individual" PAGA claim could be raised under its arbitration agreement with Sakkab. Although the existence of "individual" PAGA claims is disputed, *see Reyes v. Macy's, Inc.*, 202 Cal. App. 4th 1119, 1123 (Ct. App. 2011) (holding that a PAGA claimant may not bring an individual PAGA claim), the *Iskanian* court expressly chose not to decide the issue. *See Iskanian, LLC*, 327 P.3d at 384. Instead, the court reasoned that, even if such claims are available, individual PAGA claims would not "result in the penalties contemplated under the PAGA to punish and deter employer practices that violate the rights of numerous employees under the Labor Code." *Id.* But, once again, the state's purpose is irrelevant. A state may not insulate causes of action from arbitration by declaring that the purposes of the statute can only be satisfied via class, representative, or collective action. If the rule conflicts with the objectives of the FAA, the state rule must give way. *Concepcion*, 131 S. Ct. at 1753.

Because the *Iskanian* rule stands as an obstacle to the purposes and objectives of the FAA, there is no question—the rule must be preempted. Preemption would be consistent both with the Supreme Court's controlling decision in *Concepcion* and the FAA's "liberal federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24. Numerous state and federal courts have attempted to find creative ways to get around the FAA. We did the same in

*Laster*, and were subsequently reversed in *Concepcion*. The majority now walks that same path. Accordingly, I would affirm.